*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

ANDREW DAG BABCOCK,

      Defendant-Appellant.

UNPUBLISHED
May 30, 2024

No. 359345
Berrien Circuit Court
LC No. 2020-003325-FC

Before: YATES, P.J., and CAVANAGH and BOONSTRA, JJ.

PER CURIAM.

Defendant was convicted by a jury of two counts of first-degree criminal sexual conduct under MCL 750.520b(2)(b) (victim under 13 years old), and one count of CSC-I under MCL 750.520b(1)(b) (related by blood).[1] Defendant was sentenced to 33 to 50 years' imprisonment for the first two counts of CSC-I, and 7 years to 50 years' imprisonment for the third count of CSC-I. Defendant now appeals by right, arguing that (1) the trial court erred by denying him the opportunity to cross-examine witnesses about whether the sexual-abuse allegations were fabricated for financial gain; (2) there was insufficient evidence presented during trial to prove his convictions beyond a reasonable doubt; and (3) defense counsel violated defendant's right to effective assistance of counsel. After review, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of defendant's sexual abuse of his minor biological daughter over the course of several years. Defendant and the victim's mother married in 2001 and had four children together: three boys and one girl.

The victim's mother testified that, one morning in 2009, when the victim was four years old, the victim got syrup in her hair, and the mother sent the victim down to shower with defendant, who was already in the shower. The mother testified that she went to get the victim later and saw

---

[1] Defendant was acquitted of one additional count of CSC-I, MCL 750.520b(2)(b).

defendant standing in the shower with an erection and the victim standing next to him. She took the victim to her room and recorded a video in which she asked the victim about what happened in the shower. She placed this recording in an envelope with a letter stating that, in the event of her death, defendant must never be alone with the victim. She testified that, after the incident, the victim was not allowed to be alone with defendant, but eventually, "I let my guard down." The victim testified that, in 2013, the family moved to another home and that she had her own bedroom for the first time. She testified that defendant initiated a point system with the victim, stating that if she touched his penis, or gave him a "hand-job," she would receive seven points, and if she placed her mouth on his penis, or gave him a "blow-job," she would receive eight points. She testified that as she "got older and the system became more recurrent it became less of seven, more of eight." The victim's brothers testified that they heard defendant talking about these "transactions" with the victim.

The victim testified that, in 2016, her mother began working at a job that required her to be outside of the home for up to 12 hours a day and that defendant was in charge of "entertaining" the siblings in the summertime. She testified that defendant told her that if she came to his bedroom in the early morning after her mother left, he would take her and her siblings to a trampoline park. She testified that when she went into the bedroom, defendant "removed [her] pants and got on top of [her]," and she remembered "somehow his penis went inside [her] vagina, and [she] remember[ed] it hurted a little bit and felt really weird." The victim testified that similar incidents happened more in the summer and then throughout the school year, and sometimes, she would "try to negotiate it down to seven or eight, but that was pretty much all he wanted after that point." She testified about a similar incident of defendant putting his penis in her vagina that took place in her own bedroom as well. The victim testified that, in 2018, she told defendant to stop, and he told her: "I'll leave you alone if you just give me eight." She testified that she put "his penis in [her] mouth," but he continued to pressure her, and eventually, he got on top of her with his stomach on her back, and he "put his penis in [her] vagina and did that until he finished. . . ." She testified that the sexual abuse stopped after that incident.

The victim's mother testified that she found out about the sexual abuse by reading a text on the victim's phone in which the victim confided in her friend. She testified that defendant left the home when she confronted him and that, eventually, Children's Protective Services and police came to the home to interview the victim and the mother. As stated, defendant was found guilty of three counts of CSC-I.

Defendant now appeals.

## II. RIGHT TO CONFRONT

Defendant argues that his defense was prejudiced and his constitutional rights violated when he was prohibited from cross-examining witnesses about the specifics of his and the mother's divorce settlement, his Parkinson's diagnosis, and how that information contributed to a possible financial motivation to fabricate the sexual-abuse allegations against him. We disagree.

Whether due process has been afforded is a constitutional issue that is reviewed de novo. *People v Propp*, 508 Mich 374, 380; 976 NW2d 1 (2021). To establish a due-process violation that requires reversal of a conviction, "a defendant must prove prejudice to his defense." *People*

*v McGee*, 258 Mich App 683, 700; 672 NW2d 191 (2003). When a preserved, constitutional error is nonstructural in nature, the conviction "should be affirmed if the reviewing court is satisfied that the error is harmless beyond a reasonable doubt." *People v Graves*, 458 Mich 476, 482; 581 NW2d 229 (1998). When a constitutional error occurs during presentation of a case to a jury, the error may be assessed in context of the evidence as a whole to determine whether the error was harmless beyond a reasonable doubt. *People v Anderson*, 446 Mich 392, 405-406; 521 NW2d 538 (1994) (citation omitted).

The Confrontation Clause of the Sixth Amendment provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." US Const, Am VI. See also *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004). "By its straightforward terms, the Confrontation Clause directs inquiry into two questions: (1) Does the person in controversy comprise a 'witness against' the accused under the Confrontation Clause; and (2) if so, has the accused been afforded an opportunity to 'confront' that witness under the Confrontation Clause?" *People v Fackelman*, 489 Mich 515, 562; 802 NW2d 552 (2011).

Furthermore, a criminal defendant has a due-process right to present a defense under the state and federal Constitutions. *People v Solloway*, 316 Mich App 174, 198; 891 NW2d 255 (2016). However, the right to present a defense is not absolute. *Id*. Defendants "must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id*. (quotation marks and citations omitted). Therefore, "the right to present a defense extends only to relevant and admissible evidence." *Id*. (quotation marks and citation omitted).

In order to be admissible, evidence must be relevant, see MRE 402,[2] and in order to be relevant, evidence must be both material and probative. See *People v Henry*, 315 Mich App 130, 143-144; 899 NW2d 1 (2016) (citation omitted). Generally, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *People v Watkins*, 491 Mich 450, 470; 818 NW2d 296 (2012), quoting MRE 401. To be material, evidence must be "of consequence to the determination of the action." *People v Brooks*, 453 Mich 511, 517-518; 557 NW2d 106 (1996) (quotation marks and citation omitted). A trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. MRE 403.

In the present case, during defendant's trial, defense counsel asked the victim's mother a series of questions during cross-examination related to a defense theory that the victim fabricated the allegations against defendant at the request of her mother for financial reasons. The prosecutor objected to the line of questioning, and the trial court sustained the objection. Later during trial,

---

[2] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). This opinion relies on the version of the rules in effect at the time of trial.

the prosecution's forensic-interview expert testified that monetary gain is not a "common" reason to fabricate sexual abuse allegations but that "it happens."

The crux of defendant's argument is that if the trial court allowed him to cross-examine witnesses about the possible financial motive to fabricate, and thereby attack the victim and her mother's credibility, the jury might have judged their credibility as witnesses differently and the verdict might have been decided differently as well.

The credibility of witnesses and the weight given to their testimonies are matters for the fact-finder to determine, and we do not interfere with those determinations. See *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). Additionally, in "criminal sexual conduct cases, a victim's testimony may be sufficient to support a defendant's conviction and need not be corroborated." *Solloway*, 316 Mich App at 181. See also MCL 750.520h. Notwithstanding this precedent, defendant cites the United States Supreme Court's decision in *Davis v Alaska*, 415 US 308; 94 S Ct 1105; 39 L Ed 2d 347 (1974), to support his argument.

In *Davis*, the Court considered a far different issue than that presented in the present case:

> [W]hether the Confrontation Clause requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status as juvenile delinquent when such an impeachment would conflict with a State's asserted interest in preserving the confidentiality of juvenile adjudications of delinquency. [*Id*. at 309.]

The Court held that the defendant had been denied his right to confrontation because, although the defendant "was permitted to ask [the witness] whether he was biased," he was unable "to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Id*. at 318. The Court also held that "defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id*. The Court reasoned, "The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the witness's] vulnerable status as a probationer, as well as of [the witness's] possible concern that he might be a suspect in the investigation." *Id*. at 317-318 (internal citation omitted).

In *Davis*, the fact that the witness was on probation for the same crime that the defendant was charged with was a key element in the case, and the defense counsel's line of questioning about the witness's criminal record was highly relevant to the credibility of the witness. Further, because the witness's testimony was the sole source for defendant's conviction, it was highly relevant to the issue in the case. The present case is distinguishable from *Davis* because defendant's line of questioning regarding his Parkinson's diagnosis and the split in divorce proceedings in order to lead up to an attack on the victim's mother's credibility as a witness was *not* relevant to the issue in the case.

In denying defendant's request to question witnesses on a possible financial motive scheme, the trial court stated that "I just don't see the connection" and that the defense was

irrelevant: "I don't find that you have persuaded me that, in any way, that there is a financial benefit to lying about a CSC, especially in the timeline" of the case. The trial court also stated that "[m]otivation for financial gain is not a mitigating defense" for the crime of CSC and that defendant "failed to connect" such a motivation with the crime at issue. The record supports the trial court's findings.

The victim's mother testified that defendant opened his own law firm in 2002 and that she took care of all the financial aspects of the firm. She testified that the firm was doing very well financially by 2004, and she affirmed in her testimony that they "lived comfortably" and owned multiple properties. Both the victim and her mother testified about a sexual-abuse incident that occurred in 2009, which was corroborated by the fact that the victim's mother recorded the victim, then four years old, answering questions about the incident. The victim's mother kept this video tape with a letter inside an envelope stating that, in the event of her death, defendant must never be left alone with the victim. The victim testified that the sexual abuse continued from 2016 to 2018. According to defense counsel, defendant was diagnosed with Parkinson's disease in 2016. The sexual abuse was disclosed first to the victim's high school friends in June and July 2020, and then, in September 2020, to the victim's mother, when she read a text on the victim's phone. The victim's mother testified that she and defendant divorced and reached a settlement agreement in 2021.

As the trial court stated, defendant's line of questioning about a possible financial motive was irrelevant in light of the time line of the sexual-abuse allegations, especially when compared to the line of questioning permitted by the Court in *Davis*, in which the witness's bias was clearly and directly related to the issue whether the defendant committed burglary. Defendant argues that the disclosure of the sexual abuse occurred *after* the motivation to fabricate allegations arose (defendant's Parkinson's diagnosis) and that, therefore, exploration of that motivation should have been permitted. However, the disclosure of sexual abuse occurred in 2020, nearly four years after defendant's Parkinson's diagnosis, and nearly 10 years after the victim's mother first became aware of the possibility that defendant was sexually abusing the victim. Defendant's argument that the victim's mother planned to fabricate allegations against defendant for nearly 10 years for financial gain is too far removed from the facts of the case in order to be of consequence to the determination of the action (whether defendant sexually abused the victim). See *Brooks*, 453 Mich at 518.

Defendant's inability to question witnesses on a possible financial motive to fabricate allegations did not prejudice his defense, and the trial court's prohibition of that line of questioning was harmless beyond a reasonable doubt. See *Anderson*, 446 Mich at 405-406; *McGee*, 258 Mich App at 700. Accordingly, defendant is not entitled to a new trial.

## III. SUFFICIENCY OF EVIDENCE

Defendant argues that there was insufficient evidence to establish beyond a reasonable doubt that he engaged in sexual penetration with the victim. We disagree.

"Generally, we review a challenge to the sufficiency of the evidence in a bench trial de novo and in a light most favorable to the prosecution to determine whether the trial court could have found that the essential elements of the crime were proved beyond a reasonable doubt."

*People v Sherman-Huffman*, 241 Mich App 264, 265; 615 NW2d 776 (2000). See also *Jackson v Virginia*, 443 US 307, 324; 99 S Ct 2781; 61 L Ed 2d 560 (1979). "Circumstantial evidence and reasonable inferences therefrom may be sufficient to prove all the elements of an offense beyond a reasonable doubt." *People v Schumacher*, 276 Mich App 165, 167; 740 NW2d 534 (2007). When reviewing a sufficiency claim on appeal, we "must defer to the fact-finder by drawing all reasonable inferences and resolving credibility conflicts in support of the . . . verdict." *Id*.

The sufficiency of the evidence is measured by "whether the evidence, taken as a whole, justifies submitting the case to the trier of fact or requires judgment as a matter of law." *People v Clark*, 172 Mich App 1, 6; 432 NW2d 173 (1988). The prosecution is not required to negate "every reasonable theory consistent with innocence" as long as the elements of the offense are proven beyond a reasonable doubt. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). As long as evidence is both relevant and admissible, "it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences," and all fairly drawn inferences from the evidence should be considered when considering the sufficiency of the evidence. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). The credibility of witnesses and the weight given to their testimony are matters for the fact-finder to determine, and we do not interfere with those determinations. *Bennett*, 290 Mich App at 472. Additionally, in "criminal sexual conduct cases, a victim's testimony may be sufficient to support a defendant's conviction and need not be corroborated." *Solloway*, 316 Mich App at 181.

A defendant is guilty of CSC-I, MCL 750.520b(2)(b), if he or she engaged in sexual penetration with the victim, and the defendant was 17 years of age or older and the victim was less than 13 years old. A defendant is guilty of CSC-I, MCL 750.520b(1)(b)(*ii*), if he or she engaged in sexual penetration with the victim, and the defendant is related to the victim by blood or affinity to the fourth degree. "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of another person's body. . . ." MCL 750.520a(r). See also *Solloway*, 316 Mich App at 181.

In this case, defendant was convicted of three counts of CSC-I: two counts premised on the victim being less than 13 years old at the time of the sexual conduct, and one count premised on the blood relationship between the victim and himself. Each conviction was delineated to a specific incident of sexual abuse: defendant inserting his penis into the victim's vagina in 2016 in defendant's bedroom; defendant inserting his penis into the victim's vagina in 2016 in the victim's bedroom; and defendant inserting his penis into the victims' vagina in 2018. The victim's age is not contested. The only issue "is whether the evidence was sufficient to establish beyond a reasonable doubt that defendant engaged in sexual penetration" with the victim. *Id*.

First, the victim's testimony during trial about defendant inserting his penis into her vagina in the house in 2016, both in her bedroom and in defendant's bedroom, was sufficient to prove beyond a reasonable doubt that defendant sexually penetrated her. She testified that her mother got a new job in 2016 and had to leave the house at about 5:00 a.m.; the victim's mother testified that defendant was working from home at this time and would watch the children for 12 hours a day while she was gone. The victim testified that defendant told her and her brothers that he would take them to a trampoline park, but then communicated to the victim that "if [she] was to get up at 5:30 a.m. and go to his bedroom we could go . . . and so [she] did that." The victim testified that

when she went to his bedroom, she was "trying to be really quiet" because she "knew that [she] just wasn't supposed to talk about it. . . . Don't wake the boys up, all that stuff." The victim testified that defendant "essentially told [her] to lay down on [her] stomach, and at that point he removed [her] pants and got on top of [her]." The victim testified about the sexual penetration in detail:

> I don't remember specific—the exact specifics, but I remember somehow his penis went inside my vagina, and I remember it hurted a little bit and felt really weird. And then I don't remember how long that went on, but after that I'd felt some gushing, and after that I felt really, really gross. Squirmed out from underneath him and went to bathroom and sat there, and—sat on the toilet and was just really confused about what just happened.

The victim also testified about the sexual assault that took place in her bedroom: "[A]nother memory that I have is being told to stand on my bunk beds and the same thing with penis in vagina happened that way." The victim testified that she was standing on the bottom bunk and her hands "were like kind of holding on to the top of the bunk bed, just standing there," and defendant "was behind me." The victim testified that she felt "wet stuff, which [she] later knew as sperm," and that she "just remember[ed] feeling that on my blankets and I'd just, like, kick them to the end of my bed because I just thought that was gross."

Second, the victim's testimony during trial about defendant inserting his penis into her vagina in the basement of the house in 2018 was sufficient to prove beyond a reasonable doubt that defendant sexually penetrated her. She testified that when she was 13 years old, she was "determined" to "make [the sexual assault] stop finally." She testified that she "still owed" defendant sexual acts from "deals" that she had made with him in the past. She testified that defendant said, "I'll leave you alone if you just give me eight," and by "eight" he meant "[p]utting his penis in my mouth." She testified that afterward, defendant "tried to continue pressuring me. Like I remember him saying specifically you can't just leave a guy handing [sic] like that. Come on, [the victim's name]. And I was like no, I'm not doing this. I'm done. I did what you asked me to do." The victim testified that he then "put his penis in my vagina" until he was "[f]ully cumming and producing sperm." The victim testified about the sexual penetration in detail:

> And I tried to get up and get away. And I don't remember exactly, but somehow I ended up on the ground, in-between where our TV was, and the tile and the carpet. And I remember him doing that, but I was still struggling to get away because I didn't want to be there. And I really knew that I didn't want to be there at that point, so I was still chugging. But eventually he was (unintelligible) so I just laid there. And after—as soon as he finished I got up and turned away and ran into [her brother's] room, because that was the closest room. . . . And after a while I came out and my dad was sitting in the opposite chair from me. . . . and he just looked at me and said [the victim's name], I'm so sorry.

Given the victim's testimony, the evidence, when viewed in a light most favorable to the prosecution, was sufficient to support the trial court's finding that sexual penetration occurred beyond a reasonable doubt. See *Schumacher*, 276 Mich at 167; *Sherman-Huffman*, 241 Mich App at 265.

Defendant challenges both the victim's and her mother's credibility. However, "witness credibility is a question for the fact-finder, and this Court does not interfere with the fact-finder's role." *Solloway*, 316 Mich App at 181. Furthermore, although it is not necessary for a CSC-I conviction, *id.*, evidence was presented that corroborated the victim's testimony. Her brothers affirmed in their testimonies that they sometimes heard defendant talking about transactions, deals, and incentives with the victim. The victim's twin brother testified that, in his viewpoint, the victim was defendant's favorite and that she always got what she wanted. Additionally, the victim's mother's testimony about the incident that occurred in the shower in 2009, although not a charged incident, further corroborated the victim's testimony that defendant was sexually abusing her throughout all those years. The fact that a video exists of the victim talking about the incident immediately after it happened makes the testimony even stronger.

Defendant's CSC-I convictions were based on sufficient evidence that proved all the elements of CSC-I beyond a reasonable doubt. Therefore, the convictions are affirmed and defendant is not entitled to a new trial.

## IV. EFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that defense counsel was ineffective by: failing to present an expert on the lack of physical evidence of the alleged sexual abuse or an expert challenging the prosecution's forensic-interview expert; failing to request a hearing pursuant to *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), in order to challenge the testimony of the prosecution's sexual assault nurse examiner (SANE) expert or the prosecution's forensic-interview expert; and failing to articulate a good-faith basis, pursuant to *People v Stanaway*, 446 Mich 643; 521 NW2d 557 (1994), to disclose the victim's counseling records and medical records. We disagree.

Shortly after the sexual abuse was disclosed, the victim was interviewed at the Children's Advocacy Center (CAC). A supervisor at the CAC was admitted as an expert at trial in the areas of both forensic interviewing and child development as it relates to sexual abuse. A forensic nurse examiner who performed a sexual-assault exam on the victim was admitted as an expert at trial as a forensic nurse in the field of sexual-assault examinations. She testified that she did not find anything significant, but she explained that "it's not uncommon for children and adults to have a history of being sexually assaulted and not have any injuries to their body." She testified that "we find children most of the time, about 95 percent of the time, does not have any injuries to their genitalia when they have been assaulted. . . . It just depends how elastic their tissue is at the time of the assault."

After defendant was found guilty, he moved for a new trial, which was denied. After defendant appealed, this Court granted remand limited to conducting an evidentiary hearing on whether defense counsel was ineffective. An evidentiary hearing was conducted by the trial court, and it found that defense counsel's performance was not ineffective.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). If the trial court has held a *Ginther* hearing, the trial court "first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective

assistance of counsel." *Id*. We review the trial court's factual findings for clear error. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). A trial court's finding "is clearly erroneous when, although there is evidence to support it, the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008).

In *People v Armstrong*, 490 Mich 281, 289-290; 806 NW2d 676 (2011), the Michigan Supreme Court stated:

> A defendant must meet two requirements to warrant a new trial because of the ineffective assistance of trial counsel. First, the defendant must show that counsel's performance fell below an objective standard of reasonableness. In doing so, the defendant must overcome the strong presumption that counsel's assistance constituted sound trial strategy. Second, the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable.

"Counsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Trakhtenberg*, 493 Mich at 52 (quotation marks and citation omitted). "[D]ecisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013).

During its decision on defendant's evidentiary hearings, the trial court listed the facts regarding defense counsel's decision not to present experts on physical evidence of the sexual assaults and on the forensic interview, and it found that the facts did not constitute a violation of defendant's right to effective assistance of counsel. See *LeBlanc*, 465 Mich at 579. The trial court's findings were not erroneous. See *Trakhtenberg*, 493 Mich at 47.

The trial court stated that defense counsel's performance did not fall below an objective standard of reasonableness, see *Armstrong*, 490 Mich at 290, because first, the SANE expert that appellate counsel called during the evidentiary hearing testified that she agreed with the prosecution's SANE expert's findings overall. Although she disagreed with the way the prosecution's expert presented the 95% statistic, she agreed that it was a "generally accepted" fact in the medical community that the majority of children evaluated for sexual abuse have no physical symptoms. The trial court found that defense counsel sufficiently consulted with her own SANE expert and spoke to the prosecution's expert before trial. Furthermore, the trial court acknowledged that defense counsel "has had continuing legal education courses, training on penetration CSC cases, which she has attended," and that defense counsel's decision not to call a SANE expert was her trial strategy. The trial court concluded that it was defense counsel's decision "to limit further investigation, and this decision was well-informed. This was a reasonable investigation and a reasonable professional judgment." The trial court further stated that defense counsel did her own research and consulted her own expert in the field of forensic interviewing and that "she's aware of the forensic review protocol." The trial court stated that defense counsel did not present an expert on the topic of forensic interviewing because she "did not see the need to attack the protocol in this case."

The trial court also found that defendant had "not shown a reasonable probability that the outcome would be different but for the alleged error of counsel," *Armstrong*, 490 Mich at 290, because defendant's SANE expert at the evidentiary hearing and the prosecution's SANE expert presented very similar testimony. Additionally, the trial court stated that it did "not find a reasonable probability that the outcome would have been different if [defense counsel] had . . . called a counter-expert to [the prosecution's expert]. I am not convinced Defendant could have limited the testimony of either expert beyond that—how it came out at trial."

Defendant points to *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015), in support of his claim; however, the actions of the defense counsel in that case are distinguishable from defense counsel in the present case. In *Ackley*, 497 Mich at 389-391, 393, defense counsel chose an unqualified expert who was an opponent of defense counsel's theory, and failed to conduct research to secure suitable expert assistance. In the present case, defense counsel consulted with qualified experts on both the topic of physical evidence after sexual assault in children and forensic interviewing of children. She decided not to call either expert during trial on the basis of her trial strategy that she would be able to get the answers she wanted through cross-examination of the prosecution's witnesses. And, as the *Ackley* Court noted, in *Trakhtenberg*, 493 Mich at 54 n 9, the Court recognized that a defense attorney may be considered ineffective "for failing to consult an expert when counsel had neither the education nor the experience necessary to evaluate the evidence and make for himself a *reasonable, informed determination* as to whether an expert should be consulted or called to the stand[.]" *Ackley*, 497 Mich at 391 (quotation marks and citations omitted). But in this case, defense counsel had both the education and the experience to make that determination, as she testified that she had been an attorney for almost 10 years, she had represented approximately 50 defendants charged with CSC, and she was aware of forensic-interview protocols. Therefore, defendant's argument that defense counsel was ineffective based on the reasoning in *Ackley* is not persuasive.

If a trial court determines that scientific, technical, or other specialized knowledge will assist the jury "to understand the evidence or to determine a fact in issue, a witness qualified as an expert" may testify if the testimony is "based on sufficient facts or data," "the product of reliable principles and methods," and the proposed expert witness "has applied the principles and methods reliably to the facts of the case." MRE 702. See also *Daubert*, 509 US at 597.

MRE 702 "requires trial judges to act as gatekeepers who must exclude unreliable expert testimony." *Lenawee Co v Wagley*, 301 Mich App 134, 162; 836 NW2d 193 (2013). The purpose of a hearing in accordance with *Daubert* is "to filter out unreliable expert evidence." *Id*. Whether a *Daubert* hearing is required "is context-specific and must be tied to the factors of a particular case." *Id*. at 163 (quotation marks and citations omitted).

During its decision on defendant's evidentiary hearing, the trial court listed the facts regarding defense counsel's decision not to request a *Daubert* hearing and found that the facts did not constitute a violation of defendant's right to effective assistance of counsel. See *LeBlanc*, 465 Mich at 579. The trial court's findings were not erroneous. See *Trakhtenberg*, 493 Mich at 47.

The trial court stated that defense counsel's performance did not fall below an objective standard of reasonableness, see *Armstrong*, 490 Mich at 290, because defense counsel did not anticipate the 95% statistic testimony as it was not mentioned by the prosecution's expert before

trial; therefore, she did not try to limit that testimony in the *Daubert* hearing because it was not anticipated. In regard to the prosecution's forensic-interview expert, the trial court stated that "trial counsel knew that that witness had been qualified before and this was a well-established field of testimony." The trial court also stated:

> [Defense counsel] approached this case with significant experience in CSC cases, significant training. Also engaged in significant investigation by consulting with the SANE nurse, [name]; [the prosecution's SANE expert]; and [a forensic-interview expert]. Engaged in follow-up research and review after the consults, and thoroughly reviewed the evidence.
>
> Under the circumstances, it wasn't a—it was a reasonable, informed decision not to file a pretrial Daubert challenge as to [the prosecution's experts].
>
> \* \* \*
>
> [Defense counsel's] trial strategy was to use the prosecution's expert. From a position of knowledge and experience she argued that the evidence did not support the claims. [Defense counsel's] testimony that she knew [the prosecution's SANE expert] had been previously qualified to testify as an expert, and given her knowledge of the case, her decision not to challenge this testimony pretrial was reasonable.
>
> [Defense counsel] . . . did her own research to prepare, felt she could use [the prosecution's forensic-interview expert] to highlight the lack of evidence, lack of typical behaviors of abused children to attack the allegation. . . . For these reasons, it was reasonable trial strategy not to present counter-expert to [the prosecution's forensic-interview expert].

The trial court also stated that "I do not find a reasonable probability that the outcome would have been different" if defense counsel had filed a *Daubert* challenge, because "I am not convinced Defendant could have limited the testimony of either expert" beyond the way defense counsel limited the testimony at trial with cross-examination.

In *Stanaway*, 446 Mich at 649, the defendants in consolidated cases moved to discover the alleged victims' privileged records. The Court stated that it was "difficult to divine a precise formula for balancing against a defendant's due process rights the state's pronounced interest in its evidentiary counseling privileges that enhance the healing process in the wake of abuse." *Id*. at 676. However, the Court held:

> [I]n an appropriate case there should be available the option of an in camera inspection by the trial judge of the privileged record on a showing that the defendant has a *good-faith belief*, grounded on some demonstrable fact, that there is a reasonable probability that the records are likely to contain material information necessary to the defense. [*Id*. at 677 (emphasis added).]

Before trial, defense counsel moved for discovery of privileged information, including the victim's counseling records, arguing that the victim's statements to her counselor regarding the allegations is relevant because they could corroborate statements later made by the victim to police, and they were relevant to the victim's credibility as a witness. The trial court denied the motion, stating:

> First of all, I've not heard that that person, the victim in this case or the complaining witness has yielded that privilege for inspection in any manner, and that you have some good-faith belief that—that there is something in those documents that's material. Not just that, it could be, but that there is something, and so I know you say that you don't know what's in the documents and so you don't know what you could find, but the Stanaway case did say that you have to establish a good-faith belief grounded on some demonstrable fact that there is a reasonable probability the records would contain material necessary to your defense.
>
> . . . I'm not going to unlock that privilege if you can't show that there is something in there that you may need to use. So—plus it's not—I don't have any evidence that there is even a document for me to inspect, notes. Again I don't think our—mostly we don't know they even exist.
>
> For now your motion is denied based on the fact that you've not demonstrated anything . . . if there is some reason for you to believe that there is material evidence . . . in those documents and you can present that you can readdress this issue, you have some time, and matter of fact we will even give you a new status conference to do that . . . .

During defendant's evidentiary hearing, defense counsel testified that she moved for discovery of privileged information because "my hope was that there was going to be, you know, additional statements regarding the allegations in some of those therapy records. . . . There was nothing I could, specifically, say that I would absolutely find in those records," but that her goal was "to find some more statements and some more information from the victim." Appellate counsel asked defense counsel why she did not assert her theory of a financial motive to fabricate the allegations as a good-faith basis for requesting the counseling records, and defense counsel responded:

> That was my defense in the case and I . . . didn't want to give that away, necessarily, and I've filed several Stanaway motions in my career, and it—it takes something extremely specific to be able to get those records, and I had to kind of weigh was that going to be enough from the Judge's perspective to risk giving away my defense, and I . . . just did not think that I would succeed . . . .

During its decision on defendant's evidentiary hearing, the trial court listed the facts regarding defense counsel's motion for discovery of privileged information and found that the facts did not constitute a violation of defendant's right to effective assistance of counsel. See *LeBlanc*, 465 Mich at 579. The trial court's findings were not erroneous. See *Trakhtenberg*, 493 Mich at 47.

The trial court stated that defense counsel's performance did not fall below an objective standard of reasonableness, see *Armstrong*, 490 Mich at 290, because she properly moved for discovery and made the decision not to disclose her strongest defense, drawing from her own experience that the motion may be denied. The trial court stated that "I find that this decision was a calculated risk," and that it "was a reasonable decision." The trial court further stated that defense counsel's "choice not to seek medical records was reasonable, based upon a lack of injury and a history of medical evidence in this case, which she was aware of." The trial court also found that "[t]he defense has not shown reasonable probability the outcome would have been different, but for the alleged error." *Armstrong*, 490 Mich at 290. The trial court stated:

> I do not find defense counsel, even on this record, has met the burden in Stanaway. There is no demonstrable fact on the record that the counseling records contain information necessary to defense. Same goes for the medical records. The evidence came out at trial that there was no history of injuries, urinary tract infections, etcetera. There was no history of behavioral problems, problems— school problems of the Complainant in this case.

The trial court made its decision partly pursuant to *People v Pickens*, 446 Mich 298, 325; 521 NW2d 797 (1994), in which the Court stated that defense counsel "must be afforded broad discretion in the handling of cases, which often results in taking the calculated risks which still do sometimes, at least, pluck legal victory out of legal defeat." (Quotation marks and citation omitted). The trial court also cited *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004), in which this Court stated that a "particular strategy does not constitute ineffective assistance of counsel simply because it does not work."

The trial court was correct in finding that defendant failed to show that defense counsel's performance fell below an objective standard of reasonableness or that but for defense counsel's performance, a different result was reasonably probable. See *Armstrong*, 490 Mich at 290. Accordingly, defendant is not entitled to a new trial.

Affirmed.

/s/ Christopher P. Yates
/s/ Mark J. Cavanagh
/s/ Mark T. Boonstra